COLUMBIA BROADCASTING SYSTEM,
INC., Defendant, Appellant,

v.

Victor DeCOSTA, Plaintiff, Appellee.

CAPITAL CITIES BROADCASTING
CORPORATION

v.

Victor DeCOSTA.

C B S FILMS INC.

v.

Victor DeCOSTA.

Nos. 6769–6771.

United States Court of Appeals
First Circuit.

May 11, 1967.

---

Knight Edwards, Providence, R. I.,
with whom Ronald R. Lagueux, Providence, R. I., Carleton G. Eldridge, Jr.,
Eugene L. Girden, New York City, Edwards & Angell, Providence, R. I., and
Coudert Brothers, New York City, were
on brief, for appellants.

Leonard Decof, Providence, R. I., with
whom Alan T. Dworkin and Aisenberg,
Decof & Dworkin, Providence, R. I., were
on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is an appeal by defendants [1] from jury verdicts in the total amount of $150,000 awarded plaintiff on his claim that he created, and the defendants misappropriated, the character of Paladin, the protagonist of the CBS television series entitled "Have Gun Will Travel".

The story of this case—more bizarre than most television serial installments—is one of "coincidence" run riot. The plaintiff, of Portuguese parents, is a Rhode Island mechanic whose formal education ceased after the fourth grade. During the Depression, having tired of factory work, he hopped a freight for the West, lived in hobo jungles, and eventually became a range hand on a Texas ranch. After two years of riding and roping he returned to Rhode Island to work as a mechanic and later received training as a motor machinist in the Coast Guard. But he retained his passion for all things western. In 1947 he began to participate in rodeos, horse shows, horse auctions, and parades.

From the beginning plaintiff indulged a penchant for costume. He was already equipped with a moustache. He soon settled on a black shirt, black pants, and a flat-crowned black hat. He had acquired a St. Mary's medal at a parade and affixed this to his hat. He adopted the name Paladin after an onlooker of Italian descent had hurled an epithet at him containing the word "Paladino". On looking up the word Paladin in a dictionary he found it meant "champion of Knights" and was content that people began so to call him.[2] One day when he had donned his costume in preparation for a horse show, and was about to mount his horse, one of a group waiting for him shouted "Have Gun Will Travel", a cry immediately picked up by the children present.

The finishing touches were a chess knight, bought for fifteen cents at an auction, which plaintiff thought was a good symbol, and which he used on a business card along with the words "Have", "Gun", "Will", "Travel", and "Wire Paladin, N. Court St., Cranston, R. I.", hand-printed with separate rubber stamps; a silver copy of the chess piece on his holster; and an antique derringer strapped under his arm. So accoutered, he would appear in parades, the openings and finales of rodeos, auctions, horse shows, and a pony ring he once operated. From time to time at rodeos he would stage a western gunfight, featuring his quick draw and the timely use of his hidden derringer. He would pass out photographs of himself and cards— printed versions soon replacing the. rubber-stamped ones. Hospitals, drug stores, barber shops, sports shops, diners —all were the repositories of his cards, some 250,000 of them. Children clamored for the cards, and clustered about him to the extent that he was likened to the Pied Piper and Gene Autry. This was perhaps one of the purest promotions ever staged, for plaintiff did not seek anything but the entertainment of others. He sold no product, services, or institution, charged no fees, and exploited only himself.

Ten years after he had begun to live his avocational role of Paladin, he and his friends saw the first CBS television production of "Have Gun Will Travel", starring moustachioed Richard Boone, who played the part of an elegant knight errant of the Old West, always on the side of Good—for a fee. The television Paladin also wore a black costume, a

1. The three defendants are Columbia Broadcasting System, Inc., producer of the television series at issue, CBS Films, Inc., a wholly owned subsidiary of the System responsible for licensing the series; and Capital Cities Broadcasting Corporation, owner of several broadcasting stations showing the series in several states. For convenience we shall refer to them simply as CBS or defendants.

2. Other names he had been called were Kid Hollywood, Fidel, Gabby Hayes, the Wild Cowboy from the Southwest, and Paladino.

flat-crowned black hat bearing an oval silver decoration, and a silver chess knight on his holster, and announced himself with a card featuring a chess piece virtually—if not absolutely—identical with the plaintiff's and the words "HAVE GUN WILL TRAVEL, WIRE PALADIN, SAN FRANCISCO". The series was notably successful; it appeared in 225 first-run episodes in the United States, was licensed in foreign countries, and by the time of trial had grossed in excess of fourteen million dollars.

The writers and network executives responsible for the series testified in detail that the television Paladin was a spontaneous creation, developed in total ignorance of the attributes of his Rhode Island predecessor. The writers, Herb Meadow and Sam Rolfe, testified that the germ of the idea was the title, "Have Gun Will Travel", which Meadow had evolved from mulling over a familiar theatrical advertising phrase, "Have tux, will travel". The character was originally conceived as a denizen of contemporary New York, but was changed to a western hero because the network hoped to cast Randolph Scott in the role. The name "Paladin" resulted from a thesaurus search for words meaning "knight" or "hero" or "champion". The chess piece symbol was inspired by Meadow's observation, while teaching his son the game, that the knight's movements were uniquely erratic and unpredictable. In the pilot script for the series, Paladin used a hidden derringer because it was a convenient way to extricate him from the obligatory dangerous situation.

The show's original producer, Julian Claman, testified that after Randolph Scott and other "fairly well known" actors were found to be unavailable he selected Richard Boone to be tested for the role of Paladin. Boone appeared for the test with a moustache, for reasons unknown, and was outfitted in a black suit because it was the only available costume that fitted. The hat, bearing a silver "conche", was selected by Claman because it looked appropriate. The card, which had been described in Meadow and Rolfe's original prospectus, was realized by the CBS art department from a rough sketch by Claman. The "shocking similarity" to DeCosta's cards was pure coincidence. Boone's test was successful, and Claman, reluctant to change any element of a winning combination, decided to keep card, costume, and moustache intact for the pilot film. He also decided to add the silver chess knight to Paladin's holster because it produced a distinct article that would be marketable if the series succeeded.

Meadow, Rolfe, Claman, and the other witnesses for the defendants all testified that they had never seen DeCosta or any of his cards. The jury obviously disbelieved at least this much of their testimony, and we think it clear that they were amply justified. Thus, the plaintiff has had the satisfaction of proving the defendants pirates. But we are drawn to conclude that that proof alone is not enough to entitle him to a share of the plunder. Our Paladin is not the first creator to see the fruits of his creation harvested by another, without effective remedy; and although his case is undeniably hard, to affirm the judgments below would, we think, allow a hard case to make some intolerably bad law.

In the first place, it is by no means clear that such state law of intellectual property as we have found supports relief on these facts.[3] Several cases have been cited around the general proposition that it is an actionable wrong to appro-

---

3. Since this action was tried in the District of Rhode Island, the governing law must be the substantive law of Rhode Island or of the state indicated by Rhode Island's choice-of-law rules. But no authority from Rhode Island has been cited or found. Thus, the cases from other jurisdictions are at best persuasive in estimating what the law of Rhode Island might be; and the difficulty of applying one state's rule to a "tort" that, like this, affects the interests of many states, see Capitol Records, Inc. v. Mercury Records Corp., 2 Cir., 1955, 221 F.2d 657, 667 (L. Hand, J., dissenting), might well leave the issue in doubt even if another jurisdiction provided a case directly in point.

priate and exploit the product of another's creative effort; but all seem to involve distinguishable wrongs of at least equal or even superior significance. Most rest on the tort of "passing off": appropriation not of the creation but of the value attached to it by public association (the so-called "secondary meaning"), by misleading the public into thinking that the defendant's offering is the product of the plaintiff's established skill. E. g., Lone Ranger, Inc. v. Cox, 4 Cir., 1942, 124 F.2d 650; Chaplin v. Amador, 1928, 93 Cal.App. 358, 269 P. 544.[4] Others add an element of injury to reputation caused by a poor imitation. E. g., Lahr v. Adell Chem. Co., 1 Cir., 1962, 300 F.2d 256. And at least one combined both of these with an element of injury to a valuable contract to assert "the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality * * *." Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., Sup.Ct.1950, 199 Misc. 786, 793, 101 N.Y.S.2d 483, 492.

■ Plaintiff argues that he has established "secondary meaning" through testimony of some witnesses that they thought he was the Paladin on television and evidence that most people knew him only as Paladin, not as Victor DeCosta. Whether or not this assertion is true, it is here irrelevant, for the issue was not submitted to the jury. The complaint alleged three causes of action: misappropriation, trade and/or service mark infringement, and unfair competition by "passing off" the television Paladin as the plaintiff. Only the first was tried, the court reserving judgment on defendant's motions to dismiss the other two.

The jury was instructed that the plaintiff would be entitled to the verdict if he established:

"First. That he conceived and created said idea and character of 'Paladin, Have Gun Will Travel'; and that said idea and character was novel, original, and unique; and that he did not at any time abandon said idea and character by a publication thereof.

"Second. That the defendants * * * did copy said idea and character without the permission of the plaintiff and used them in the television series, 'Have Gun Will Travel.'

And

"Third. That the plaintiff sustained damages as a result of such copying and use of said idea and character. * * * *"

Thus, the judgment can only be supported on a rule of law that would allow recovery upon proof of creation by the plaintiff and copying by the defendants, and nothing else. We do not find such a rule in the cases cited above.

Moreover, the leading case affording a remedy for mere copying, International News Serv. v. Associated Press, 1918, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, is no longer authoritative for a least two reasons:[5] it was decided as a matter of general federal law before the decision in Erie R. R. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; and, as it prohibited the copying of published written matter that had not been copyrighted (indeed, as news it could not be copyrighted, 248 U.S. at 234, 39 S.Ct. 68, 63 L.Ed. 211), it has clearly been overruled by the Supreme Court's recent decisions in Sears, Roebuck & Co. v. Stiffel Co., 1964, 376 U.S. 225, 84 S.Ct.

---

4. The plaintiff quotes the Lone Ranger case as involving "the element of fraudulent attempt of someone to 'reap where he has not sown' and to appropriate to himself 'the harvest of those who have sown'." 124 F.2d at 653. But the opinion makes it clear that the "harvest" is the goodwill generated by long establishment of the Lone Ranger in the public eye, and the element of fraud is quite as important as the element of appropriation.

5. See also Cheney Bros. v. Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279, 280 (L. Hand, J.): " * * * there are cases where the occasion is at once the justification for, and the limit of, what is decided. This [*INS*] appears to us such an instance * * *."

784, 11 L.Ed.2d 661, and Compco Corp. v. Day-Brite Lighting, Inc., 1964, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669. While this normally would not prevent the state court from adopting the reasoning of *INS* in fashioning a rule of state law, we think it important to consider the scope of state power in this area in view of *Sears* and *Compco*.

It is true that *Sears* and *Compco* both deal with copying of articles covered by invalid design patents. But the opinions refer throughout to both copyright and patent; and in *Compco* the Court took pains to articulate the broad scope of its decisions:

> "Today we have held * * * that when an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." 376 U.S. at 237, 84 S.Ct. at 782.

More fully, that policy is to encourage intellectual creation by offering the creator a monopoly in return for the disclosure and eventual surrender of his creation to the public.[6]

█ Does the language in *Compco*, "whatever the federal patent and copyright laws leave in the public domain", refer to creations that Congress has deliberately chosen not to protect or more broadly to those it has simply not pro-

tected, whether by choice or by chance? In the case of patents the two questions are coterminous, for Congress has deliberately chosen not to protect inventions lacking the element of originality, and an invention is thus either patentable or unprotectible. In the case of "writings" there is no such universal test of qualification. But Congress has established a procedural scheme of protection by notice and registration. The necessary implication of this approach, we conclude, is that, absent compliance with the scheme, the federal policy favoring free dissemination of intellectual creations prevails. Thus, if a "writing" is within the scope of the constitutional clause, and Congress has not protected it, whether deliberately or by unexplained omission, it can be freely copied. See Cheney Bros. v. Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279.

The compelling reasons for this rule are well stated in Judge Learned Hand's prophetic dissent in Capitol Records, Inc. v. Mercury Records Corp., 2 Cir., 1955, 221 F.2d 657, 664–667, where he referred to (1) the anomaly of allowing a creator to acquire a perpetual monopoly of his work under state law when he cannot obtain the limited right of exploitation under federal law, and (2) the impossibility of affording effective protection against copying except by a uniform national law.[7] See also RCA Mfg. Co. v. Whiteman, 2 Cir., 1940, 114 F.2d 86, 89–90.

To this plaintiff gives two answers. He argues that a character is not copyrightable—by which we must understand

6. U.S.Const. art. I, § 8, cl. 8:
"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;". See also Graham v. John Deere Co., 1966, 383 U.S. 1, 5–10, 86 S.Ct. 684, 15 L.Ed.2d 545.

7. This case presents the problem very well. Counsels' failure to address it in their briefs is a tribute to its perplexity. Here a Rhode Island plaintiff performed in Rhode Island, Connecticut, Maine, Massachusetts, and New York, and once gave a batch of his cards to a truckdriver

heading west. Can Rhode Island law effectively prohibit copying from a performance in New York or from a card carried to California by a person who may have received it in Kansas? Would Rhode Island resolve the choice of law question by inquiring whether California, the site of the television series, would prohibit the copying? If so, should California law apply to govern the rights of people in, say, Arkansas to view the intellectual "property" of a Rhode Island citizen, stolen perhaps in Connecticut, perhaps in Kansas, certainly in parts unknown?

that it is not within the scope of Congress's power under the copyright clause —and that in any event a creation in the form of a public performance is protectible as an unpublished work under 17 U.S.C. § 2.[8] For the first proposition the authority cited is Warner Bros. Pictures, Inc. v. Columbia Broadcasting Sys., 9 Cir., 1954, 216 F.2d 945, which held that the assignee of the copyright of the novel *The Maltese Falcon* could not prevent the author from using the character Sam Spade in a sequel. But that case is inapposite, because it held only (a) that the contract of assignment did not convey the exclusive right to use the characters in the novel, and (b) that the sequel, *The Kandy Tooth*, was not so similar as to infringe the copyright. That is far from saying that characters are inherently uncopyrightable.[9]

■ A more substantial argument for this first proposition is that the plaintiff's creation is not a "writing" in the sense used in the copyright clause (or, what is the same thing, that it is not an "article" in the sense used in *Sears* and *Compco*). There is no question that the term is to be interpreted more broadly than its common meaning would indicate. See, e. g., Mazer v. Stein, 1954, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (statuette used as a lamp base). But it has been argued that it should be limited to mean some identifiable, durable, material form. Nimmer, Copyright Publication, 56 Colum.L.Rev. 185, 196 n. 98 (1956). And it is argued here that the plaintiff's creation, being a personal characterization, was not reduced and could not be reduced to such a form.

■ To this argument there are several answers. First, while more precise limitations on "writings" might be convenient in connection with a statutory scheme of registration and notice, we see no reason why Congress's power is so limited. Second, we cannot say that it would be impracticable to incorporate into the copyright system a procedure for registering "characters" by filing pictorial and narrative description in an identifiable, durable, and material form. Finally, however, there comes a point where what is created is so slight a thing as not to warrant protection by any law. All human beings—and a good part of the animal kingdom—create characters every day of their lives. Individuals often go beyond the realm of unconscious creation and devise characterizations for their own and others' amusement. Many a starred performer has so begun, and continued to grow on the borrowings from others. At some point his innate talent and eclectic poaching may enable him to attract a following, and ultimately to secure the law's protection against imitators. At what point short of this there should be additional protection we do not say. But in view of the federal policy of encouraging intellectual creation by granting a limited monopoly at best, we think it sensible to say that the constitutional clause extends to any concrete, describable manifestation of intellectual creation; and to the extent that a creation may be ineffable, we think it ineligible for protection against copying *simpliciter* under either state or federal law.

---

8. "Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor."

9. Cf. Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119, 121:
   "* * * If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one

of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's 'ideas' in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly."

For the second proposition, that the plaintiff's creation is an unpublished work protected under 17 U.S.C. § 2, the leading authority is Ferris v. Frohman, 1912, 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492, which held that the public performance of a play did not constitute publication in the sense of an abandonment to public use. But in that case the Court specifically noted that the play involved had not been "printed and published"; that is, no copies of the script had been distributed publicly.[10]

Here, plaintiff's "performance" consisted of two components: appearing in public and passing out cards and photographs. No other "action" was involved, except an occasional "quick draw" demonstration at a rodeo. So far as his costume and menacing appearance were concerned, it was fully conveyed on the cards bearing his photograph—which also contained the chess piece, the slogan, and the name "Paladin". The cards were passed out in great quantities over the years to all who would have them. So far as any action accompanying his personal appearance is concerned, whether it be simply riding a horse, or staging a quick-draw gun fight, these are hallowed shelf items in the tradition of the early West. In any event, the theme and plots of defendants' television series could not be said to have derived from anything created by plaintiff which was not revealed by his cards.

The cards were unquestionably "writings" within the meaning of the copyright clause, and arguably were copyrightable under the statute. See 17 U.S.C. §§ 1, 5(g), 5(k); Burrow-Giles Lith. Co. v. Sarony, 1883, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349. The consequence is that the plaintiff's character-creation was published, even under the

doctrine of *Ferris*, and that this case falls squarely under the rule of *Sears* and *Compco*. Not having copyrighted the cards, the plaintiff cannot preclude others from copying them. We accordingly reverse.

---

10. We note, furthermore, that the Court relied on such cases as Tompkins v. Halleck, 1882, 133 Mass. 32, for the proposition that at common law performance of a play was not an abandonment of it to public use. In *Tompkins* the Supreme Judicial Court of Massachusetts abrogated the theory that a play might properly be copied from memory after witnessing a performance, adopting instead the theory that even a reproduction from memory violated the implicit license of the spectator's ticket of admission. Were it necessary, we might question whether the same result would apply to a free open-air performance where the audience is limited only by conditions of visibility, and no license might be implied.