Victor DeCOSTA

v.

VIACOM INTERNATIONAL, INC.

Civ. A. No. 89–0598–T.

United States District Court,
D. Rhode Island.

March 11, 1991.

Mark J. Hagopian, Providence, R.I., for plaintiff.

Jeffrey Schreck, Robert Karmen, Providence, R.I., Robert M. Callagy, Mark A. Fowler, New York City, for defendant.

## MEMORANDUM AND ORDER

TORRES, District Judge.

This is an action by Victor DeCosta for infringement of his trademark and/or service mark rights and for unfair competition under both common law and the Lanham Act (15 U.S.C. §§ 1114(1) and 1125(a)). The case is presently before the Court on the motion of Viacom International, Inc. ("Viacom") to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), or, in the alternative, for summary judgment pursuant to Rule 56 on the grounds that the action is barred by the doctrines of res judicata, collateral estoppel and/or laches.

## BACKGROUND

DeCosta is a former rodeo performer. During the 1940's, he conceived the idea of a western hero whom he named "Paladin." [1] DeCosta's character had a mustache and wore a black outfit that included a hat affixed with a medallion. He also carried calling cards bearing facsimiles of a chess piece (i.e. a "knight") and the slogan "Have Gun Will Travel, Wire Paladin." The chess piece logo was imprinted on the holster of his six-shooter as well. In addition, Paladin carried an antique derringer concealed under his arm. Since 1947, DeCosta, as Paladin, has continuously appeared at rodeos, horse shows, parades and charitable functions throughout the eastern United States and California where he distributed his cards to spectators.

In June of 1957, Columbia Broadcasting System, Inc. ("CBS") began televising a

---

1. For a more detailed description of the origins of the Paladin character, see *Columbia Broadcasting Sys. v. DeCosta,* 377 F.2d 315, 316–17 (1st Cir.1967) [hereinafter *"DeCosta I"*].

"western" series entitled "Have Gun Will Travel," starring a character called "Paladin." The television Paladin wore a black costume identical to that worn by DeCosta's character, including the medallion on his hat. CBS's Paladin also carried a calling card bearing the words "Have Gun Will Travel, Wire Paladin." Both the card and his holster were embossed with the same chess piece logo used by DeCosta's character. Furthermore, the pilot episode of the CBS series included a scene in which the television Paladin used a concealed derringer to win a gunfight.

After watching these programs, DeCosta apparently concluded that not all of the television bandits were portrayed in the series. Accordingly, after an unexplained delay of eleven years, he applied to the Patent and Trademark Office (the "PTO") for registration of his mark. At the same time, he sued CBS, one of its subsidiaries that licensed the series and the corporation owning several television stations that broadcast the show. The suit alleged misappropriation of his idea, common law trademark and/or service mark infringement and unfair competition. The PTO deferred action on DeCosta's application pending the outcome of that litigation.

The misappropriation count was severed and tried before a jury and another judge of this Court. CBS presented extensive testimony from writers and network executives responsible for the series who explained the marked similarity between the television Paladin and DeCosta's character as purely coincidental. The jury did not believe that testimony and returned a verdict for DeCosta in the amount of $150,-000.00. Judgment was entered on that verdict, and the defendants appealed.

The First Circuit reversed. *Columbia Broadcasting Sys. v. DeCosta,* 377 F.2d 315, 321 (1st Cir.1967) [hereinafter *"DeCosta I"*]. Although it shared the jury's skepticism of CBS's story and characterized the defendants as "pirates," the Court found that simply copying another's creation is not, by itself, actionable. The Court recognized that appropriating the *value* attached to a creation by exploiting its "secondary meaning" may constitute a form of unfair competition (i.e. the tort of "passing off") if it misleads the public into thinking that the resulting product was created by the plaintiff. However, the Court noted that the unfair competition count had not been submitted to the jury.

As to the misappropriation count the Court found it lacking in merit based upon its reading of *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) [hereinafter *"Sears-Compco"*]. Specifically, the Court interpreted *Sears-Compco* to mean that Art. I, § 8, cl. 8 of the United States Constitution, which confers copyright power on Congress, preempts any state efforts to protect writings and other concrete, describable manifestations of intellectual creation within the scope of that power and leaves those creations in the public domain unless they are protected by federal copyright laws. *DeCosta I,* 377 F.2d at 319. The Court found that DeCosta's creation failed to qualify for protection under the copyright laws as an unpublished work (i.e. one that had not been abandoned to public use by publication) because his creation was completely embodied in the cards that he freely distributed to others. The Court concluded that such distribution constituted publication of DeCosta's work and that by failing to copyright the cards, DeCosta left his creation in the public domain where it could be freely copied. *Id.* at 321.

On remand, the remaining counts for common law trademark infringement and unfair competition were presented, by agreement, to a Magistrate for determination on cross motions for summary judgment. Relying on the Supreme Court's intervening decision in *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), the Magistrate held that those claims were not preempted under *Sears-Compco.* He went on to find that the defendants had infringed upon DeCosta's marks and had unfairly competed by falsely advertising the marks to be their own. Accordingly, the Magistrate entered judgment requiring the defendants to ac-

count for what amounted to $12 million in profits. *DeCosta v. Columbia Broadcasting Sys.*, Civil Action No. 3130 (D.R.I. Apr. 15, 1974).

Once again, CBS appealed, and once again the First Circuit reversed. *DeCosta v. Columbia Broadcasting Sys.*, 520 F.2d 499 (1st Cir.1975) [hereinafter *"DeCosta II"*]. The Court endorsed the Magistrate's holding that, under *Goldstein*, the states remain free to "grant to authors the 'exclusive Right to their respective Writings' " and to "protect businesses in the use of their trademarks, labels, or distinctive dress in the packaging of goods so as to prevent others, by imitating such markings, from misleading purchasers as to the source of such goods." *Id.* at 510–11 (quoting *Goldstein*, 412 U.S. at 560, 93 S.Ct. at 2311; *Sears–Compo*, 376 U.S. at 232, 84 S.Ct. at 789). The Court acknowledged that it may have erred in holding the misappropriation claim was preempted but expressed unwillingness to reopen the matter saying:

> We face a dilemma. *Goldstein* tells us that we were, in our interpretation of the preemptive reach of the Copyright Clause, over-inclusive. And yet, what we decided in *DeCosta I* has settled, for this case, the issue of misappropriation.

*Id.* at 510.

The Court then focused on what it identified as the critical issue underlying the trademark infringement and unfair competition counts, namely, "whether there was a deceiving of the public as the result of defendants' actions" or whether "the defendant's use of a trademark similar to the plaintiff's created a likelihood of confusion." *DeCosta II*, 520 F.2d at 513 (citation omitted). It found nothing to support a finding that the defendants "passed off" their Paladin or program as the plaintiff's creations. *Id.* Nor did it find the identical nature of the marks used by plaintiff and defendants sufficient to establish a likelihood of confusion. *Id.* at 513–15. Therefore, the Court found no basis for liability

for common law service mark infringement or unfair competition and accordingly reversed and remanded with instructions to enter judgment for the defendants.

After DeCosta unsuccessfully petitioned the United States Supreme Court for a writ of certiorari, the PTO activated his application for registration of his mark. That application was vigorously opposed by CBS which, in the meantime, had assigned its syndication rights to Viacom, a "spinoff" corporation that licenses local television stations to broadcast reruns of the series. CBS's opposition was based on the claim that registration would adversely affect its agreement with Viacom and cause it economic injury. Despite that opposition, the PTO granted DeCosta's application in 1975.[2] It referred to CBS's opposition as "a bald-faced argument that [CBS], already branded a pirate, should be allowed to make off with additional plunder unhindered by any inconvenience that might result from the recognition of [DeCosta's] lawful rights." *Columbia Broadcasting Sys. v. DeCosta*, 192 U.S.P.Q. 453, 456 (P.T.O. Trademark Trial and Appeal Bd. 1976).

The instant complaint charges that, since 1975 Viacom has licensed the "Have Gun Will Travel" series for broadcast throughout the United States with full knowledge of DeCosta's federal registration and without his permission. It contains five counts: Count I alleges federal trademark infringement in violation of 15 U.S.C. § 1114(1); Count II alleges misappropriation and common law trademark infringement; Count III alleges unfair competition in violation of 15 U.S.C. § 1125(a); Count IV alleges common law unfair competition; and Count V alleges negligent or intentional infliction of emotional distress. Viacom characterizes this suit as nothing more than a rehash of matters long since determined and seeks dismissal or summary judgment on the grounds that plaintiff's claims are barred by the doctrines of res judicata and collat-

---

**2.** DeCosta's registered mark consists of the familiar knight chess piece surrounded by the phrase "Have Gun Will Travel" and, below these, the phrase "Wire Paladin," *see Columbia*

*Broadcasting Sys. v. DeCosta*, 192 U.S.P.Q. 453, 454 (P.T.O. Trademark Trial and Appeal Bd. 1976).

eral estoppel and that laches precludes De-Costa from maintaining this action.

## DISCUSSION

### I. *The Summary Judgment Standard*

Since affidavits have been filed, the Court will treat Viacom's motion as one for summary judgment. In passing on that motion, the Court must bear in mind that summary judgment is appropriate only when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making that determination, the Court must view the evidence in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir. 1990); *United States Fire Ins. Co. v. Producciones Padosa, Inc.,* 835 F.2d 950, 953 (1st Cir.1987).

However, the mere assertion that there is *some* fact in dispute is insufficient to defeat a motion for summary judgment. The disputed fact must be *material* and the dispute must be *genuine.* A fact is deemed material if, under applicable substantive law, it may affect the outcome of the case. Moreover, a dispute is considered genuine only if there is adequate evidence to require resolution of the disagreement at trial. Unsupported allegations are insufficient to create a genuine dispute. Once the movant has presented probative evidence establishing its entitlement to judgment, the party opposing the motion must set forth specific facts demonstrating that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Lipsett v. University of P.R.,* 864 F.2d 881, 894–95 (1st Cir.1988).

### II. *Res Judicata and Collateral Estoppel*

█ The doctrines of res judicata and collateral estoppel are designed to establish a point at which litigation comes to an end.

They serve three basic purposes: (1) promoting judicial economy by preventing repetitive litigation; (2) establishing certainty and respect to judgments; and (3) protecting the party relying on the prior adjudication from vexatious litigation. *See generally* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4403, at 11–22 (1981 & Supp.1990). The doctrines reflect the principle that once a case has been heard and decided, a litigant is not entitled to an "encore." 1B J. Moore, *Moore's Federal Practice* ¶ 0.405[1], at 186 (1988) [hereinafter *"Moore's"*]. On the other hand, neither res judicata nor collateral estoppel bars a party from seeking to vindicate rights or litigate issues not encompassed by the prior suit.

█ DeCosta implies that he should not be prevented from bringing this action because *DeCosta I* and *DeCosta II* were wrongly decided. As support for that contention, he cites at least one treatise criticizing those decisions. R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 15.17, at 55–56 (4th ed. Supp.1983). Such an argument is inapposite for two reasons. First, res judicata and collateral estoppel are not mere technical rules of convenience. Rather, they are expressions of a fundamental public policy favoring repose for both society and litigants. *Moore's* ¶ 0.405[1], at 186. Consequently, their applicability is not affected by the equities of the claim at issue. They represent a determination that claims and/or issues already litigated and decided should be barred no matter how meritorious they appear to be. *Jeter v. Hewitt,* 63 U.S. (1 How.) 352, 364, 16 L.Ed. 345 (1859).

Second, no matter how vehemently the plaintiff or others may disagree, the First Circuit's holdings in *DeCosta I* and *DeCosta II* are binding on this Court. Therefore, the only issue presented is whether the requirements of res judicata and/or collateral estoppel have been satisfied.

The principles governing res judicata (i.e. claim preclusion) and collateral estoppel (i.e. issue preclusion) are set forth in Sec-

tion 17 of the *Restatement (Second) of Judgments* as follows:

A valid and final personal judgment is conclusive between the parties, except on appeal or other direct review, to the following extent:

. . . .

(2) If the judgment is in favor of the defendant, the claim is extinguished and the judgment bars a subsequent action *on that claim* (see § 19); .

(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in a subsequent action between them on the same or a different claim, with respect to any issue *actually litigated and determined if its determination was essential to that judgment* (see § 27).

*Restatement (Second) of Judgments* § 17 (emphasis added).

■ There is no question that CBS and Viacom are in privity with one another for res judicata and/or collateral estoppel purposes. The established rule is that a judgment in favor of a predecessor in interest is conclusive in subsequent litigation between the successor in interest and the same adversary. *See, e.g., Behrens v. Skelly*, 173 F.2d 715, 717–18 (3d Cir.1949); *Moore's* ¶ 0.411[12], at 485–86; *see also Restatement (Second) of Judgments* § 44. Because CBS assigned its syndication rights to Viacom, preclusion of DeCosta's right to sue CBS would also bar him from suing Viacom with respect to the same claims and/or issues litigated in *DeCosta I* or *DeCosta II.*

A. *Res Judicata (Claim Preclusion)*

 1. *The Federal Trademark Infringement and Unfair Competition Claims (Counts I and II)*

As previously noted, the doctrine of res judicata provides that an adverse judgment bars another action by the plaintiff against the defendant on the "same claim." *Restatement (Second) of Judgments* § 19. Unlike collateral estoppel, identity of issues is not required. Consequently, even though *DeCosta II* did not decide DeCosta's *federal* trademark infringement or unfair competition claims, he may be barred

from asserting them in this action if they constitute the "same" claims as the common law claims previously litigated.

■ For purposes of delineating the boundaries of a claim for res judicata purposes, Rhode Island follows the principles set forth in the *Restatement (Second) of Judgments. See Capraro v. Tilcon Gammino, Inc.*, 751 F.2d 56, 58 (1st Cir.1985); *Manego v. Orleans Bd. of Trade*, 773 F.2d 1, 5 (1st Cir.1985), *cert. denied*, 475 U.S. 1084, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); *Gonsalves v. Alpine Country Club*, 563 F.Supp. 1283, 1287 (D.R.I.1983), *aff'd*, 727 F.2d 27 (1st Cir.1984). One of those principles is that, in determining whether identity of claims exists, the relevant inquiry is whether the claims arise from a common nucleus of facts or seek redress for the same injury. That approach is codified in § 24 of the Restatement which adopts what is termed a "transactional" test. Section 24 provides that:

(1) [T]he claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

*Restatement (Second) of Judgments* § 24(1).

Consequently, a plaintiff may not get additional bites of the apple by demanding multiple forms of relief for the same injury or by cloaking a single claim in a variety of legal theories. Res judicata cannot be circumvented by "splitting" one cause of action into a multiplicity of suits. *Restatement (Second) of Judgments* § 24 comment c; *Moore's* ¶ 0.410[1].

■ On the other hand, res judicata does not bar a plaintiff from seeking redress for post-judgment acts even though similar injuries and/or legal theories are asserted in both suits. Thus the Restatement recognizes that events taking place *after* the prior litigation is concluded may "comprise a transaction which may be made the basis of a second action not precluded by the first." *Restatement (Second) of Judgments* § 24 comment f.

Therefore, in this case, the issue is whether Viacom's syndication of the "Have Gun Will Travel" series after DeCosta registered his mark is merely part of the transaction that was the subject of the prior suit or whether it is sufficiently distinct from the conduct giving rise to the previous litigation that it may be fairly characterized as a separate transaction.

■ Viacom asserts that the two suits are based on the same transaction because licensing the series for rebroadcast did not involve any conduct different from that already found by the First Circuit to be lawful. There are several flaws in that argument. First, *DeCosta I* and *DeCosta II* held only that CBS was *not liable* for broadcasting the "Have Gun Will Travel" series during the period before the suit was brought. Those decisions did not vest CBS with any property interest in DeCosta's creation or any license to continue exploiting it even after he registered his mark.

In addition, Viacom's subsequent actions are not so similar or interrelated to CBS's that they should be deemed part of the same transaction underlying *DeCosta I* and *DeCosta II*. Viacom's syndication of the series occurred after the original broadcasts that were the subject of the previous suit had been completed. Therefore, the two clusters of conduct are at least temporally distinct. In other words, this case is not based on acts committed prior to the antecedent litigation and selectively omitted from it. Rather, it is a case based on acts that the defendant had not yet committed when the first suit was litigated.

Moreover, the *federal* trademark infringement rights that DeCosta seeks to vindicate in this case did not exist when *DeCosta I* and *DeCosta II* were decided because he did not register his mark until after that time. Consequently, DeCosta cannot be said to have impermissibly "split" his cause of action by merely advancing a new theory of recovery. DeCosta's registration of his mark vested him with new rights under the Lanham Act that he did not possess when the previous suit was decided. Since those rights and the conduct allegedly violating them both postdate *DeCosta I* and *DeCosta II*, the federal claims are not part of the same transaction underlying the prior litigation.

### 2. The Common Law Trademark Infringement and Unfair Competition Claims (Counts II and IV)[3]

■ Federal registration of DeCosta's mark is not a sine qua non of his common law claims for trademark infringement and unfair competition. However, like their federal counterparts, those claims are based on acts committed after *DeCosta I* and *DeCosta II* were decided. Therefore it is difficult to see how they can constitute part of the claims asserted in that litigation.

The difficulty is compounded by the fact that, as will be discussed *infra*, the intervening registration of DeCosta's mark created a "likelihood of confusion" that was lacking when the series was originally aired by CBS.

In short, since Viacom syndicated the "Have Gun Will Travel" series *after DeCosta I* and *DeCosta II* were litigated and after the legal landscape had been altered, its actions cannot be viewed as part of the "same" transaction giving rise to the prior suit. Therefore, if there is any bar to prosecuting them, it must emanate from the doctrine of collateral estoppel rather than res judicata.

### B. Collateral Estoppel (Issue Preclusion)

The doctrine of collateral estoppel is embodied in § 27 of the Restatement which provides:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is

---

**3.** The Court need not deal with the emotional distress claim contained in Count V because it does not appear to be an independent substantive claim. As the First Circuit indicated in *DeCosta II,* emotional distress is merely a theory regarding the damages sought and requires a predicate of liability to support it. Consequently, it is dependent upon the substantive claims asserted in Counts I through IV. 520 F.2d at 515.

essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

*Restatement (Second) of Judgments* § 27.

■ Viacom points out that likelihood of confusion is an essential element of the trademark infringement and unfair competition claims and that the Court in *DeCosta II* specifically found the evidence insufficient to establish that element. Accordingly, Viacom argues that DeCosta is collaterally estopped from asserting those claims.

That argument fails to take into account the intervening events that have materially altered the legal principles governing resolution of the likelihood of confusion issue. The First Circuit's holding in *DeCosta II* was predicated on what it found to be a "paucity" of evidence that the public would be confused as to the origin of the Paladin character. Since then, DeCosta has registered his mark which establishes a rebuttable presumption of likely confusion that did not exist when *DeCosta II* was decided. In *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3 (5th Cir.1974), the Fifth Circuit explained the effect of registration as follows:

> Under the [Lanham] Act, registration is prima facie evidence of the registrant's ownership of the mark and of the registrant's exclusive right to use the mark in commerce in connection with the services specified in the registration certificate. Thus registration is sufficient to establish prima facie (1) the required prior use (2) of a registrable mark (3) which is likely to be confused with another's use of the same or a similar mark.

*American Heritage*, 494 F.2d at 10 (citations omitted).

DeCosta's registration and apparent use of his mark since 1975 also impacts the "likelihood of confusion" calculus in another way. One of the factors to be considered in determining likelihood of confusion is the strength of the plaintiff's mark. *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir.1981). Use of a mark for five consecutive years subsequent to registration makes the mark incontestable. *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 820 (1st Cir.1987) (citing 15 U.S.C. §§ 1065, 1115(b)). Incontestability, in turn, creates a presumption that the mark is a relatively strong one for purposes of the likelihood of confusion analysis. *Dieter v. B & H Ind.*, 880 F.2d 322 (11th Cir.1989), *cert. denied*, — U.S. —, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990); *Wynn Oil Co. v. Thomas*, 839 F.2d 1183 (6th Cir.1988); *see Keds Corp. v. Renee Intern. Trading Corp.*, 888 F.2d 215 (1st Cir.1989). As the *Dieter* court stated:

> We hold that incontestable status is a factor to be taken into consideration in likelihood of confusion analysis. Because [the plaintiff's] mark is incontestable, then it is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark.

*Dieter*, 880 F.2d at 329.

These factors constitute precisely the kinds of "[c]hange in applicable legal context" that the Restatement recognizes as exceptions to the general rule of issue preclusion. *See Restatement (Second) of Judgments* § 28 comment c. Thus, § 28 provides:

> Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
>
> . . . .
>
> (4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action. . . .

*Restatement (Second) of Judgments* § 28(4).

Comment f explains the rationale for that exception as follows:

> f. *Differences in the burden of persuasion (Subsection (4)).* To apply issue

preclusion in the cases described in Subsection (4) would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden been imposed. While there may be many occasions when such a holding would be correct, there are many others in which the allocation and weight of the burden of persuasion (or burden of proof, as it is called in many jurisdictions) are critical in determining who should prevail. Since the process by which the issue was adjudicated cannot be reconstructed on the basis of a new and different burden, preclusive effect is properly denied.

*Restatement (Second) of Judgments* § 28 comment f.

The Restatement also furnishes the following example:

10. A brings an action against B for injuries incurred in an automobile accident involving cars driven by A and B. Under the governing law, A has the burden of proving his freedom from contributory negligence. Verdict and judgment are given for B on the basis that A has not sustained that burden. In a subsequent action by B against A for injuries incurred in the same accident, the issue of A's negligence (on which B now has the burden of persuasion) is not concluded by the first judgment.

*Restatement (Second) of Judgments* § 28 comment f, illustration 10.

In a nutshell, although the issue in the prior litigation and this case is nominally the same, the context in which it arises is materially different and that difference could easily affect the outcome in this case. The presumptions regarding likelihood of confusion and the strength of DeCosta's mark are significant new elements in the equation that did not exist when *DeCosta I* and *DeCosta II* were decided. Together, they so alter the mix of factors bearing on likelihood of confusion that the prior resolution of the issue does not bar DeCosta's trademark infringement or unfair competition claims in this case.

 Nor does the prior litigation bar the misappropriation claim contained in Count II. As previously noted, collateral estoppel only applies to issues "actually litigated and determined" in the previous suit. In *DeCosta I*, the First Circuit never reached the question of whether DeCosta had proved the elements of his substantive misappropriation claim. Instead, it rejected that claim on the ground that the common law basis for it had been preempted by Art. I, § 8, cl. 8 of the United States Constitution, *DeCosta I*, 377 F.2d at 319, an interpretation that it later acknowledged to be "over-inclusive." *DeCosta II*, 520 F.2d at 510.

In sum, the issues presented in this case are either different from those addressed in *DeCosta I* and *DeCosta II* due to intervening changes in the applicable legal framework or they are issues that were not previously litigated and determined. Accordingly, the plaintiff is not collaterally estopped from maintaining this action.

### III. *Laches*

Viacom's final argument is that the instant action is barred by laches. Specifically, it cites DeCosta's long delay in bringing suit and the substantial time and effort it has expended in licensing the series for rebroadcast.

Laches is an affirmative defense that must be proven by the party asserting it. Fed.R.Civ.P. 8(c). Under Rhode Island law, it requires a showing of unexcused failure to assert a known right coupled with prejudice to the adverse party. *Rodriques v. Santos*, 466 A.2d 306, 311 (R.I. 1983). The mere passage of time is, by itself, insufficient to invoke laches. The delay must result in such an unfair disadvantage to the defendant that the plaintiff should be estopped from asserting his claim. *Gaglione v. Cardi*, 120 R.I. 534, 388 A.2d 361, 364 (1978). What constitutes laches is ordinarily a question of fact to be determined in light of the circumstances of the particular case. *Pukas v. Pukas*, 104 R.I. 542, 247 A.2d 427, 429 (1968); *Arcand v. Haley*, 95 R.I. 357, 187 A.2d 142, 146 (1963).

In order to establish the defense of laches in a trademark action, the defendant must prove each of the following elements:

1. A substantial unexplained delay by the plaintiff prior to filing suit;
2. Awareness by the plaintiff that the disputed trademark was being infringed; and
3. A reliance interest resulting from the defendant's continued development of goodwill during the period of delay.

*NAACP v. NAACP Legal Defense & Educ. Fund,* 753 F.2d 131, 137 (D.C.Cir.1985).

The defense of laches is a creature of equity. *Jonklaas v. Silverman,* 117 R.I. 691, 370 A.2d 1277, 1280 (1977); *Grand d'Hauteville v. Montgomery,* 92 R.I. 453, 169 A.2d 916, 918 (1961). Consequently, the defendant's reliance must be justifiable in the sense that the defendant must have acted with a reasonable expectation that its conduct was permissible. *See Pukas,* 247 A.2d at 429–430 (change in condition must be in good faith and laches applies if defendant relies in good faith on prior court decree even though decree turned out to be in error). To put it another way, laches may not be used to shield a party from the consequences of conduct it knows to be wrongful. *Baker v. Simmons Co.,* 307 F.2d 458, 466 n. 4 (1st Cir.1962) (laches does not apply if defendant had calculated design to trade upon plaintiff's reputation and misappropriate goodwill in plaintiff's mark).

In this case, Viacom has done nothing more than cite the lapse of time and the efforts it has expended in promoting De-Costa's idea. It has failed to present any evidence establishing a good faith belief that it was justified in continuing to exploit DeCosta's mark. On the contrary, CBS's opposition to the registration of that mark on the ground that it would interfere with Viacom's syndication rights is powerful evidence indicating knowledge that rebroadcasting the series could violate DeCosta's rights. Nor is there any basis for inferring that it would be otherwise inequitable to allow DeCosta to maintain this action. If Viacom has illegally exploited DeCosta's mark, there is nothing unjust about requiring it to account for the profits it has realized. An equitable defense cannot be invoked to permit a wrongdoer to keep something to which he is not entitled. Consequently, Viacom has failed to establish the requisite elements of a laches defense.

## CONCLUSION

For all of the foregoing reasons, Viacom's motion for summary judgment is hereby denied.

IT IS SO ORDERED.