**RIVERBANK, INC., Plaintiff,**

v.

**RIVER BANK, Defendant.**

**Civil Action No. 07–12354–WGY.**

United States District Court,
D. Massachusetts.

June 12, 2009.

Brett N. Dorny, Law Office of Brett N. Dorny, Northboro, MA, for Plaintiff.

Tara C. Clancy, Thomas F. Holt, Jr., Phi Lan M. Tinsley, K & L Gates LLP, Boston, MA, for Defendant.

## MEMORANDUM

YOUNG, District Judge.

## I. INTRODUCTION

The plaintiff Riverbank, Inc. ("Riverbank") brought this action against the defendant River Bank (the "Bank") alleging federal trademark infringement. Riverbank is a business that provides tax and accounting services. The Bank provides banking services in the Merrimack Valley in Massachusetts and southern New Hampshire and changed its name from Lawrence Savings Bank to River Bank in 2006. Since that time, Riverbank claims that it has been inundated with telephone calls, facsimiles, and other communications intended for the Bank. Riverbank claims that the Bank's conduct has caused, and likely will continue to cause, confusion, mistake, and deception among the consuming public.

On December 21, 2007, Riverbank filed its Complaint ("Compl.") [Doc. 1], alleging federal trademark infringement in vio-

lation of the Lanham Act, 15 U.S.C. §§ 1117 and 1125. On February 27, 2009, the Bank moved for summary judgment. Motion for Summary Judgment [Doc. 21]. On April 15, 2009, after hearing oral argument on the Bank's motion, the Court granted summary judgment in favor of the Bank from the bench, reserving its right to issue a written opinion. Since this matter necessarily hinges on a balancing test to assess "likelihood of confusion," the Court here explicates its reasoning.

## II. THE STANDARD FOR SUMMARY JUDGMENT

The standard for summary judgment in a trademark infringement case is well-settled in this circuit. Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989). When the defendant in a civil case moves for summary judgment, the test to be applied is "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In essence, the question is whether the evidence is "so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. The Court is mindful that "while infringement ... cases often present factual issues that render summary judgment inappropriate, this is not invariably so." *Kazmaier v. Wooten*, 761 F.2d 46, 48–49 (1st Cir.1985); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir.1981).

## III. THE FACTUAL RECORD

Viewed in a light most favorable to Riverbank, the record reveals that a jury reasonably could find the material facts set forth below:

Riverbank is a Massachusetts corporation having a principal place of business in Brockton, Massachusetts. Compl. ¶ 1. The Bank is a Massachusetts savings bank having a principal place of business in North Andover, Massachusetts. *Id.* ¶ 2. Riverbank was incorporated on January 8, 2001, and continuously since that time has provided accounting and tax preparation services. *Id.* ¶¶ 6–7. Since its incorporation, Riverbank has used the mark "Riverbank, Inc." in connection with providing these services. *Id.* ¶ 8. The public recognizes "Riverbank, Inc." as a service mark of Riverbank with respect to tax preparation and other financial services. *Id.* Lawrence Savings Bank, predecessor to the Bank, was incorporated in 1868. *Id.* ¶ 9. Since its incorporation, the Bank has been providing banking services in the Merrimack Valley in Massachusetts and southern New Hampshire. *Id.* The Bank has five branches in Massachusetts, and one in New Hampshire. *Id.* In 2006, Lawrence Savings Bank decided to change its name. *Id.* ¶ 10. After an investigation, Lawrence Savings Bank decided to change its name to River Bank. *Id.*

On April 13, 2006, while the Bank was considering new names, James Brett ("Atty. Brett"), counsel for the Bank, sent a letter to Riverbank regarding the possible conflict of the "River Bank" name. The Bank's Statement of Facts ("Bank's Facts") [Doc. 23] ¶ 57. The letter indicated that the Bank was considering "River Bank," among other names, suggested that the new name might cause concern at the Secretary of State's office, and asked if Riverbank would be willing to change its corporate name (not the name under which it does business) to alleviate the concern.

*Id.* Upon receipt of the letter, Daniel Cosgrove ("Mr. Cosgrove"), owner of Riverbank, called Atty. Brett and indicated that he would address the issue once tax season had subsided. Riverbank's Counterstatement of Facts ("Riverbank's Facts") [Doc. 25 Attach. 1] ¶ 61. Beginning in May 2006, Mr. Cosgrove called Atty. Brett numerous times and left several voicemail messages. *Id.* These calls and voicemail messages went unanswered and unreturned. *Id.*

In June 2006, without further addressing the issue with Riverbank, the Bank proceeded to change its name. Bank's Facts ¶ 63. At about that time, Riverbank began receiving telephone calls, letters and facsimiles intended for the Bank. *Id.* ¶ 67. These communications included requests for employment verification, account verification, and bank information for paying off mortgages. *Id.* ¶¶ 67–73. On March 16, 2007, counsel for Riverbank sent a letter to Atty. Brett addressing the ongoing confusion. Riverbank's Facts ¶ 92. Atty. Brett never responded. *Id.*

Since 2001, Riverbank has used the mark "Riverbank, Inc." in connection with its services. Bank's Facts ¶ 23. On its business cards, letterhead and signage, Riverbank presents its mark in a large font with no stylization. Riverbank's Facts ¶ 24; *see* Appendix "A." Riverbank's mark is one word, and it does not use a shortened version of its mark (i.e., "Riverbank" without "Inc."). Bank's Facts ¶ 26. Riverbank's mark often is accompanied by the phrase "a tax planning and preparation firm" and Mr. Cosgrove's name and qualifications as a tax planner. *Id.* ¶ 25.

The Bank's name change from Lawrence Savings Bank to River Bank became legally effective on June 23, 2006. *Id.* ¶ 63. The Bank's logo consists of the words "RIVER" and "BANK", with the first letter of each word a slightly larger font and capitalized (i.e., RIVERBANK). *Id.* ¶ 65; *see* Appendix "B." When the logo is in color, "RIVER" and "BANK" (without a space) appear in different colors. *Id.* ¶ 65. The logo also is used in black and white. *Id.* The Bank only uses "River Bank" (as two words) in connection with legal documents. Riverbank's Facts ¶ 64.

In 2006, Atty. Brett conducted a trademark search, at which time Riverbank did not have any federal trademark registrations or pending applications. Bank's Facts ¶ 20. Riverbank later applied for a registration for the mark "Riverbank, Inc."; the application was not filed until March 2007, however, after the Bank had changed its name in June 2006. *Id.* Riverbank has since abandoned its trademark application. *Id.* ¶ 21.[1]

Riverbank provides accounting and tax preparation services. Bank's Facts ¶ 27. The Bank provides banking services in the Merrimack Valley in Massachusetts and southern New Hampshire. *Id.* ¶ 2. Riverbank does not offer banking services. *Id.* ¶ 31. In fact, Riverbank does not offer any of the services provided by the Bank, and they are not competitors. *Id.*

Riverbank advertises in the local Yellow Pages, inserts Mr. Cosgrove's business card in publications of local sports organizations and the local police association, sends occasional mailings on its company letterhead, has two registered domain

---

1. Neither Riverbank's failure to register its trademark nor its abandonment of its application are pertinent to the present action. *See Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 372 (1st Cir.1980) (explaining that cancellation of a federal trademark cannot extinguish common law rights that the federal registration did not confer), *abrogated on other grounds by, Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 776, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

names on the internet, and pays to advertise its services with two third-party website providers. *Id.* ¶¶ 37–48. Riverbank also is listed on various third-party internet websites that are not paid for by Riverbank. *Id.* ¶ 49. These websites can be accessed by search engines such as Google and Yahoo. *Id.* Riverbank does not monitor or police these third-party websites. *Id.* ¶ 50. A number of these websites list Riverbank as "River Bank"—using two words rather than one. *Id.* ¶ 51.

Prior to June 2006, Riverbank did not receive any correspondence intended for any other entity having a similar name. Riverbank's Facts ¶ 91. After the Bank changed its name, Riverbank began receiving communications presumably intended for the Bank. *Id.*

Riverbank has produced evidence of eighteen documented instances of alleged confusion from June 2006 through late 2008. Bank's Facts ¶ 68. Riverbank admits that whether the Bank was the intended recipient of each misdirected communication is, at best, a "guess." *Id.* ¶ 71. Mr. Cosgrove is unable to state how long each misdirected call lasted, but his testimony suggests that they were anywhere from a few minutes to over fifteen minutes. *Id.* ¶¶ 73–78. Mr. Cosgrove also is unable to quantify the amount of Riverbank's alleged damages, stating generally that "[t]ime is money to me," and "[m]oney certainly would have been spent on phone calls … Money certainly would have been spent on forwarding faxes." *Id.* ¶ 83. This money includes charges Riverbank may have incurred for exceeding the permissible number of phone calls on its phone plan, and the ink and paper for incoming faxes. *Id.* ¶ 84. Mr. Cosgrove has further testified that Riverbank has neither lost any profits nor lost any clients to the Bank. *Id.* ¶ 82.

## IV. ANALYSIS

Applying the law to the above material facts, and reflecting a view of the record in a light most favorable to Riverbank, the Court must determine whether Riverbank has demonstrated a substantial likelihood of confusion.

### A. Trademark Infringement in General

■ The First Circuit has set forth three prerequisite elements that a plaintiff must satisfy in order to receive trademark protection: 1) the mark must be used in commerce; 2) the mark must be non-functional; and 3) the mark must be distinctive. *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 36 (1st Cir.1998). To prevail on a trademark infringement claim, a plaintiff must show: 1) use and therefore ownership of the mark; 2) use by the defendant of the same mark or a similar one; and 3) likelihood that the defendant's use will confuse the public, thereby harming the plaintiff. *DeCosta v. Viacom Int'l, Inc.,* 981 F.2d 602, 605 (1st Cir.1992). Here, the parties do not dispute that Riverbank has satisfied the above prerequisites and elements, save for demonstrating the requisite "likelihood of confusion."

### B. Likelihood of Confusion

It is well-settled that "[t]he touchstone for analysis in a trademark or service mark case, whether brought under state or federal law, is likelihood of confusion." *Pump, Inc. v. Collins Mgmt., Inc.,* 746 F.Supp. 1159, 1165 (D.Mass.1990). It also is clear in the First Circuit that a plaintiff alleging trademark infringement must establish more than a possibility of confusion; rather, the plaintiff must demonstrate a substantial likelihood of confusion. *See International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Center,* 103 F.3d 196, 200–

01 (1st Cir.1996) [hereinafter *"IAM"*] ("To demonstrate likelihood of confusion a markholder ... must show more than the theoretical possibility of confusion."); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194 (1st Cir. 1980) ("[T]here must be a substantial likelihood that the public will be confused as to the source of the goods."). The plaintiff need not, however, make a showing of *actual* confusion to succeed on a claim of trademark infringement. *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 120 (1st Cir.2006) ("[A] trademark holder's burden is to show likelihood of confusion, not actual confusion."); *Pignons*, 657 F.2d at 490 (cautioning that "[e]vidence of actual confusion is not invariably necessary to prove likelihood of confusion").

## C. Reverse Confusion

 Riverbank contends that this case is not the ordinary case of trademark infringement; rather, it argues, this is a case of "reverse confusion." Under the classic "forward confusion" theory, a trademark holder—or senior user—alleges that consumers will purchase goods or services from the infringing party—or junior user—under a mistaken belief that they are purchasing from the senior user. *See, e.g., Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 71–72 (1st Cir.2008); *Pignons*, 657 F.2d at 492 n. 4. In a case of "reverse confusion," however, the senior user objects to the junior user's use of a mark that will cause consumers to associate the senior user's goods or services with the junior user. *See Visible Sys.*, 551 F.3d at 72; *Capital Films Corp. v. Charles Fries Prods.*, 628 F.2d 387, 393–94 (5th Cir.1980). A senior user may suffer harm from reverse confusion when the junior user "saturates the market" or offers inferior products or services, thereby diminishing the value of the senior user's mark.

*Visible Sys.*, 551 F.3d at 72 (quoting *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir.2006)). "In more general terms, [a claim of reverse confusion] is a case of a little-known senior user being infringed by a more powerful junior user." *Pump*, 746 F.Supp. at 1166.

Similar to other circuits that have considered such claims, the First Circuit has adopted the concept of reverse confusion. *See, e.g., Visible Sys.*, 551 F.3d at 71–72; *Attrezzi*, 436 F.3d at 38–39; *DeCosta*, 981 F.2d at 608; *Pump*, 746 F.Supp. at 1165–67. The Court recognizes that reverse confusion is actionable, as "the contrary view would constitute a 'return ... to the 19th century view that only passing off is actionable.'" *Pump*, 746 F.Supp. at 1167 (quoting *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219, 1236 (D.Colo.1976)). The Court further notes, however, that in either case, "forward confusion" or "reverse confusion," the plaintiff must establish likelihood of confusion. *See, e.g., Visible Sys.*, 551 F.3d at 72; *Attrezzi*, 436 F.3d at 39; *Pignons*, 657 F.2d at 492 n. 4; *Pump*, 746 F.Supp. at 1167.

## D. *Pignons* Factors

 The First Circuit has identified eight factors to be weighed in assessing likelihood of confusion: 1) the similarity of the marks; 2) the similarity of the services; 3) the relationship between the parties' channels of trade; 4) the relationship between the parties' advertising; 5) the classes of prospective purchasers; 6) evidence of actual confusion; 7) the defendant's intent in adopting its mark; and 8) the strength of the plaintiff's mark. *Astra Pharm. Prods. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983) (citing *Pignons*, 657 F.2d at 487). While the Court's analysis is guided by these factors, the Court is cognizant that the list

is not exhaustive and no single factor is determinative. *See e.g., Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 15 (1st Cir.2004); *I.P. Lund*, 163 F.3d at 43; *IAM*, 103 F.3d at 201.

The Court thus turns to an analysis of the marks under the *Pignons* factors:

## 1. Similarity of the Marks

■ Similarity of the marks is determined "on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons*, 657 F.2d at 487 (internal quotation omitted). "The degree of similarity between two marks . . . is determined by analyzing their sight, sound, and meaning." *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 24 (1st Cir.2008) (citing *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir.1987)).

Riverbank's mark—"Riverbank, Inc."—is one word with a capital R, followed by "Inc." *See* Appendix "A." Mr. Cosgrove, owner of Riverbank, testified that "Riverbank" is never used without the "Inc." Bank's Facts ¶ 26. The Bank's mark—RIVERBANK—as it appears in all forms other than legal documents, is two words, "RIVER" and "BANK", all capital letters, without a space between the words, and employs a slightly larger font for the R and B than the rest of the letters. *See* Appendix "B." Riverbank contends that "RIVERBANK" is one word. It seems clear, however, that it is two words without a space. When "RIVERBANK" is in color, the word "RIVER" is blue and the word "BANK" is green. When "RIVERBANK" is in black and white, the words appear in different shades (i.e., "RIVER" darker than "BANK"). In addition, the stylized form of "RIVERBANK" often is accompanied by a green and blue tower. The Bank uses "River Bank", two words with a space, only for legal documents.

The Bank argues that it consistently distinguishes between "RIVER" and "BANK," creating the intended impression that it is a duly licensed bank. It does so by using a larger font for the first letters of the two words, extending the leg of the second "R" in "RIVER," and employing two different colors or shades. Riverbank acknowledges, in its Opposition to Defendant's Motion to Amend, that the two marks consist of "entirely different word[s] in the English language." Opposition to Defendant's Motion to Amend [Doc. 15] at 6. Riverbank states that instead of indicating a bank, "Riverbank" means "the slopes bordering a river." *Id.* at 5. The Bank points out that Riverbank could not lawfully use the word "Bank," standing alone, because Massachusetts law prohibits entities not authorized to conduct business as a bank from using the word "bank" in their names. Mass. Gen. Laws ch. 167, § 37.

While "phonetically identical," the two marks are, indeed, entirely different words in the English language, and employ different visual displays. *Pump*, 746 F.Supp. at 1167 (citing *Karmikel Corp. v. May Dep't Stores Co.*, 658 F.Supp. 1361, 1372–73 (S.D.N.Y.1987)). Furthermore, the First Circuit has recognized that otherwise similar marks are not likely to be confused "if they are used in conjunction with clearly displayed names, logos or other source-identifying designations of the manufacturer." *IAM*, 103 F.3d at 204; *see also Pignons*, 657 F.2d at 487. The record evidence is that Riverbank's mark always is accompanied by "Inc.", and often is accompanied by the phrase "a tax planning and preparation firm" and Mr. Cosgrove's name and qualifications as a tax planner. The Bank's mark, on the other hand, often is accompanied by a green and blue tower.

Notwithstanding the noted dissimilarities, the Court is mindful of its duty to

consider the record evidence in the light most favorable to Riverbank. Considering the "sight, sound and meaning" of the marks, Riverbank's best argument is that the marks are "phonetically identical." While the Court cannot state that the two marks are dissimilar, this similarity is tenuous at best and, standing alone, does not mandate a finding of likelihood of confusion.

### 2. Similarity of Services

The Bank offers banking services. These services include offering real estate loans, construction, consumer and commercial loans, and checking, money market, certificate of deposit, and individual retirement accounts. Riverbank, on the other hand, offers tax planning and preparation services. Riverbank also offers some "oddball" financial services, including business projections and bookkeeping. Bank's Facts ¶ 28. By its own admission, Riverbank offers none of the services that the bank offers and vice versa. Furthermore, the Bank offers regulated banking services that Riverbank does not and cannot offer.

The relevant analysis concerns whether there is a similarity of services likely to lead to confusion. *Pignons,* 657 F.2d at 487–88. Riverbank argues that the services, while not identical, are related— "[b]oth companies operate in the financial services sector." Riverbank Opposition to Summary Judgment ("Riverbank Opp'n") [Doc. 25] at 7. The Court is wary of such a broad generalization. *See Alta Vista Corp. v. Digital Equip. Corp.,* 44 F.Supp.2d 72, 77 (D.Mass.1998) (Gertner, J.) (noting that the increasing level of generality leads to the unwarranted conclusion that any products or services are similar). In *Pignons,* for example, even though the parties sold the same product—a camera— the court considered the intended use, function and cost of the cameras. *Pig-*

*nons,* 657 F.2d at 487–88 ("Both the products in this case are single lens reflex cameras; otherwise they have little in common."); *see also Astra Pharm.,* 718 F.2d at 1205–06 (granting summary judgment because a broad inference that both products are used in same general field "is not sufficient to demonstrate that a genuine issue exists concerning likelihood of confusion"); *Alta Vista Corp.,* 44 F.Supp.2d at 77 (literary services and internet search engine services are not confusingly similar even though both are involved in the same media); *Northern Trust Corp. v. Northern Bank & Trust Co.,* No. 89–3052–T, 1991 WL 346397, at *2 (D.Mass. Nov. 26, 1991) (Tauro, C.J.) (no likelihood of confusion between financial and banking services offered by the plaintiff bank holding company and the defendant local bank based on the differing levels of sophistication between the services).

The services offered by Riverbank and the Bank, while related under the broad umbrella of "financial services," are dissimilar. By Riverbank's own admission, it offers none of the services that the Bank offers and vice versa. This factor thus favors the Bank.

### 3. Channels of Trade, Channels of Advertising, and Prospective Purchasers

The Court considers these three factors together, as the First Circuit has recognized that they tend to be interrelated. *See, e.g., Beacon Mut.,* 376 F.3d at 19 (citing *IAM,* 103 F.3d at 204); *Boston Athletic Ass'n,* 867 F.2d at 30; *Astra Pharm.,* 718 F.2d at 1206; *Pignons,* 657 F.2d at 488.

The Bank distinguishes its channels of trade and advertising from Riverbank's on multiple levels. First, the Bank advertises on the North Shore of Massachusetts and

in southern New Hampshire. For purposes of fraud protection, the Bank does not offer deposit services to individuals who are unable to show a local connection with one of its branch offices. The Bank does not have any customers in Brockton. Riverbank's business is centered in Brockton. Riverbank's advertising is, admittedly, limited, with the vast majority of its new clients coming by way of "word of mouth" and referrals. Riverbank also has a very limited presence on the internet. The Bank, on the other hand, advertises in promotional and marketing materials, on television and radio, in paid print advertisements, by press releases in local newspapers, and via its website at *www.riverbk. com.* Riverbank does not refute the geographic differences with respect to channels of trade and advertising.

With respect to prospective purchasers, Riverbank argues that both it and the Bank "offer their services to individuals, partnerships, companies and corporations," as well as "average customers." Riverbank Opp'n at 7. Riverbank contends, therefore, that "[t]his similarity greatly supports the likelihood of confusion." *Id.* Again, the Court is hesitant to adopt as legally sufficient such broad generalizations.

Considering these three interrelated factors together, the Court concludes that Riverbank has failed to produce evidence of a sufficient overlap between its and the Bank's channels of trade, channels of advertising, and prospective purchasers. In fact, the record evidence reveals stark dissimilarities between Riverbank and the Bank. These three factors thus undercut Riverbank's position.

### 4. Evidence of Actual Confusion

Riverbank states that it is "regularly contacted by persons who are actually seeking the Bank." Riverbank Opp'n at 8.

In support of its contention of actual confusion, Riverbank has produced eighteen documented instances of confusion from June 2006 through late 2008. These instances include an employment verification request from an employment agency, a real estate manager and a leasing company seeking verification of bank assets, and persons from banks and investment firms seeking wire transfer information. The majority of these instances were documented on notepads, some contemporaneously, and some after the fact.

It is unclear whether or not eighteen instances of confusion from June 2006 through late 2008 rise to the level of actual confusion to support a finding of likelihood of confusion. In *Hasbro, Inc. v. Clue Computing, Inc.,* 66 F.Supp.2d 117 (D.Mass.1999) (Woodlock, J.), for instance, the court held that "one, two or three [confused] people over four years ... does not constitute the level of actual confusion necessary to support a general finding of likelihood of confusion." *Id.* at 124; *see also Pignons,* 657 F.2d at 489–90 (a single misdirected order for a camera and a deposition suggesting an instance of possible customer confusion did not constitute a likelihood of confusion); *Black Dog Tavern Co. v. Hall,* 823 F.Supp. 48, 56 (D.Mass. 1993) (Tauro, C.J.) (a comment confusing two products and at least one request to plaintiff for defendant's product over a two year period, absent more evidence, weighed against a finding of likelihood of confusion). By contrast, cases in which courts concluded sufficient evidence of actual confusion contained significantly more evidence of confusion. *See Calamari Fisheries, Inc. v. The Village Catch, Inc.,* 698 F.Supp. 994, 1003–04 (D.Mass.1988) (Woodlock, J.) (evidence including a newspaper article confusing the plaintiff's and defendant's restaurants and numerous affi-

davits from staff and customers detailing confusion leading to mistaken purchases).[2]

Furthermore, as noted in *Hasbro*, "the kind of confusion that is more likely to result ...—namely, that consumers will realize they are at the wrong site and go to an Internet search engine to find the right one—is not substantial enough to be legally significant." *Hasbro*, 66 F.Supp.2d at 125. *But see Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1110 (9th Cir.1999) (recognizing "a brand of confusion called 'initial interest' confusion, which permits a finding of likelihood of confusion although the consumer quickly becomes aware of the source's actual identity.").

The instances of actual confusion alleged by Riverbank are akin to "temporary confusion." *See Astra Pharm.*, 718 F.2d at 1207. Riverbank has failed to offer any evidence "whatsoever that anyone ever [purchased the Bank's services] thinking [they] came from [Riverbank], or that anyone ever [purchased Riverbank's services] believing that they came from [the Bank]." *Id.* Furthermore, and crucial to this Court's analysis, the record is devoid of any evidence that the "temporary confusion ... had any effect whatever on the ultimate decision of a purchaser whether to [purchase services]." *Id.*; *see also Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 582–83 (2d Cir.1991) (confusion irrelevant where plaintiff supplied no link between confusion and eventual purchase decision); *Alta Vista*, 44 F.Supp.2d at 79 (dismissing relevance of incidents of confusion where confusion did not affect ultimate purchase or sale); *Pump*, 746 F.Supp. at 1169–70 (none of the evidence presented by plaintiff showed that the allegedly confused consumers mis-

takenly believed that the defendant's product actually was released by the plaintiff). Here, Riverbank has not produced any evidence that the alleged confusion resulted in a mistaken purchase by any consumers.

The Court is mindful, however, that Riverbank is not required to show that the confusion caused lost profits or lost customers. *Beacon Mut.*, 376 F.3d at 15. The First Circuit has joined other circuits holding that "actual confusion is commercially relevant if the alleged infringer's use of the mark 'could inflict commercial injury in the form of ... a diversion of sales, damage to goodwill, or loss of control over reputation' on the trademark holder. The fact that the injury is to a company's reputation or goodwill, rather than directly to its sales, does not render the confusion any less actionable." *Id.* (internal citations omitted). Here, however, Riverbank has failed to offer any evidence that would permit a finding that the alleged actual confusion is commercially relevant. *Compare id.* at 17 (misdirected premium payments could lead to lapse in policy which, in turn, could result in harm to goodwill or reputation).

Riverbank has offered eighteen documented instances of actual confusion from June 2006 through late 2008. Riverbank concedes, however, that it has neither lost any customers to the Bank, nor has it lost any profits. Further, even drawing all reasonable inferences in Riverbank's favor, the record evidence could not support a finding that the alleged confusion is commercially relevant.

### 5. The Bank's Intent

Riverbank contends that the Bank was aware of Riverbank prior to selecting its

---

2. The Court notes the case of *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3rd Cir.1978), wherein the Third Circuit concluded that nineteen misdirected letters in four years were not sufficient evidence of actual confusion to establish likelihood of confusion in the marketplace.

new mark. The Bank contends that it selected the mark before it was aware of Riverbank's existence. For purposes of this motion, it is reasonable to infer that the Bank was aware of Riverbank when it first considered the name "River Bank," among other names, and it certainly was aware of Riverbank before it selected the mark. Indeed, in April 2006, while the Bank was considering new names, counsel for the Bank sent a letter to Riverbank regarding the possible conflict of the "River Bank" name. Bank's Facts ¶ 57. The letter indicated that the Bank was considering "River Bank," among other names, suggested that the new name might cause concern at the Secretary of State's office, and asked if Riverbank would be willing to change its corporate name (not the name under which it does business) to alleviate the concern. *Id.* ¶¶ 57–60.

In *Attrezzi*, Maytag, the well-known appliance maker, selected the name "Attrezzi" for a product line. 436 F.3d at 35. Before launching the line, however, Maytag learned through a customary trademark investigation that Attrezzi LLC, a small retail store, was using the term for its business. *Id.* Maytag's in-house counsel initially warned of a potential problem. *Id.* After investigating the situation further, however, the in-house counsel determined that there would not be an issue, and Maytag launched its "Attrezzi" line. *Id.* The retail store filed suit, and a jury concluded that Maytag had willfully infringed Attrezzi's trademark. *Id.* at 36. The First Circuit affirmed, concluding that the jury had rejected Maytag's "innocent explanation," and "seemingly concluded . . . that Maytag was well aware of a substantial risk of confusion and nonetheless decided to gamble." *Id.* at 40.[3]

Given that the Bank and Riverbank are not competitors and do not offer the same services, it would not be reasonable to infer that the Bank intended to "reap what it had not sowed" or get a "free ride." *Pump*, 746 F.Supp. at 1170. In light of *Attrezzi*, however, this factor cuts both ways.

### 6. Strength of Riverbank's Mark

Strong marks enjoy the greatest protection against infringement. *See Volkswagenwerk*, 814 F.2d at 819; *Pignons*, 657 F.2d at 492. The First Circuit has considered the following factors in determining the strength of a plaintiff's mark: 1) the length of time it has been used and the plaintiff's renown in the field; 2) the strength of the mark in the field; and 3) the plaintiff's actions in promoting its mark. *Boston Athletic Ass'n*, 867 F.2d at 32. With respect to the strength of its mark, Riverbank, in its opposition, fails to cite any legal authority for its assertions. Rather, it states that it is "not a large company . . . , [h]owever, it is still entitled to protection." Riverbank Opp'n at 9. Furthermore, Riverbank states, again without legal authority, that "[t]he law does not allow a large competitor to destroy the value of a mark through ignoring the rights of a smaller competitor." *Id.* Again, as noted above, the evidence presented does not suggest that Riverbank and the Bank are competitors.

Turning to the factors to be considered by this Court, Riverbank has been using its mark for approximately eight years. Riverbank has neither offered any evidence of renown in its field, nor has it offered any evidence suggesting that it is well-known in its field. Absent any evi-

---

**3.** The *Attrezzi* court noted, however, that "there is some distance . . . between a company's knowing decision to risk a law suit and a factual inference that customer confusion is likely." 436 F.3d at 40.

dence to the contrary, the Court concludes that Riverbank's mark is weak, and this factor thus favors the Bank.

## V. CONCLUSION

After examining and weighing the eight *Pignons* factors, the Court concludes that Riverbank has failed to demonstrate a substantial likelihood of confusion. At best, Riverbank has presented evidence that would permit a finding of a similarity between the two marks, and a finding that the Bank adopted the mark in spite of its early recognition that it might be problematic. The court is swayed, however, by the following: the dissimilar services offered by the parties; the dissimilar channels of trades, channels of advertising, and prospective purchasers; the relatively weak evidence of actual confusion; and the weakness of Riverbank's mark. Furthermore, Riverbank admits that it does not compete with the Bank, it does not offer the same services as the Bank or vice versa, and it has neither lost profits nor lost any customers to the Bank. While none of these factors or admissions, standing alone, is determinative, the Court concludes that, viewing the record evidence as a whole, no reasonable jury could find a substantial likelihood of confusion among the consuming public.

Accordingly, the defendant River Bank's motion for summary judgment [Doc. 21] was ALLOWED.